### GROSS et ux. v. BLÉCKER et al.

### No. 10370.

Court of Civil Appeals of Texas. Galveston.

April 1, 1937.

Rehearing Denied April 29, 1937.

Harry Dow and Daniel Schlanger, both of Houston, for appellants.

Walter F. Brown, of Houston, for appellees.

CODY, Justice.

This is a boundary line dispute. At the time the suit was instituted by Henry Blecker, he owned the record title to 2 acres off the west side, and defendants I. Gross and wife owned the record title to 1.31 acres off the east side of a 3.31-acre tract, fronting 625 feet on what is now Bissonett street in Houston, which was formerly owned by William Albrecht. While the suit was pending, C. U. Spawn intervened, alleging that he had acquired plaintiff's title. Intervener's petition, like plaintiff's, was in the form of trespass to try title to recover the whole of the 2-acre tract. Defendants disclaimed as to all the 2-acre tract except a portion adjoining their 1.31 acres, approximately 47 feet wide, with a depth of about 230 feet; that is, having the same depth as that of the 2-acre and the 1.31-acre tracts. The tract which was in dispute was under defendants' fence, and defendants pleaded in their answer the three, five, and ten-year statutes of limitation (Vernon's Ann.Civ.St. arts. 5507, 5509, 5510).

The evidence introduced by plaintiff and intervener was: That while Albrecht yet owned the 3.31-acre tract, he had a surveyor divide it into the 2-acre and 1.31-acre tracts, the surveyor having staked them off, and planted cast-iron stakes or pipes at the two corners common to each tract; then built a fence on the division line. Shortly afterwards—on September 30, 1913 —plaintiff purchased from Albrecht the 2-acre tract, fronting 377.47 feet on what is now Bissonett street. Plaintiff also had the 2 acres surveyed when he bought, and saw the corner markers that had been planted by the surveyor, and that the fence was then on the surveyed line, and that it ran within about 20 feet of the barn; and, several years later, when he applied for a loan on the property, he

and the man making the loan stepped the property off, and found the fences in their proper places. Some of plaintiff's witnesses testified as to the location of the division line fence, some of whom located it with reference to the barn and others with reference to the line of Dunlavy street. And Gale, a contractor, who leased defendants' tract the latter part of 1924 and early part of 1925, while Bissonett was being paved, testified that he had had the division line fence moved over, and one of his hands who helped move it over testified to its being moved over to allow plenty of room to turn a four-mule team in between the barn and fence. Defendants purchased their tract from a grantee of Albrecht in 1916; they had their tract surveyed about a · month before the trial, and their surveyor testified that when he ran their line (that is the line fronting on Bissonett) the distance called for in their deed, he found an old stake planted about 2 inches from where he located the corner, and which practically checked the work of the previous surveyor, this stake was identified by another witness as being in every respect like the one the former surveyor had planted there. The tax assessments made by defendants were introduced to show that they only rendered the property for taxes as 1.31 acres. The deed of trust given by defendants in 1922, describing the north line as 247.5 feet (which was the distance called for in the deed from Albrecht), was introduced by plaintiff and intervener. The paving assessment was also introduced, as was a listing by Gross of his property for sale, which described the property as fronting 250 feet on Bissonett. Indeed, no contention was made that appellants had a record title to more than 1.31 acres of land, or of its having a width of more than 247.5 feet.

Defendants' evidence was that when they bought the property it was under fence, and that the fences were still standing where they had always stood, and they had held the excess in their tract, making the same use of it as the remainder of their tract, and by limitation had perfected title to a strip of land approximately 47 feet wide, which was in addition to the width of 247.5 feet, called for in the field notes in their deeds.

Four special issues on limitation were submitted to the jury, and were found adversely to defendants, who appeal.

Appellants, sometimes hereinafter referred to as defendants, have presented thirty-eight assignments of error, seventeen of which relate to the court's rulings upon the admissibility of evidence; two complain of the court's refusal of defendants' motion to dismiss plaintiff from the case; five complain of the issues submitted to the jury; one, of the court's failure to grant defendants' motion for an instructed verdict; seven, of the court's refusal to give instructions specially requested by defendants; five complain of opposing counsel's argument to the jury as improper; and one, of the court's refusal to permit defendants' counsel to have the opening and closing arguments. It is manifestly impossible to discuss all of the assignments. After careful consideration of defendants' propositions relating to the court's rulings on the admissibility of evidence, we have found that none of their assignments, complaining of such rulings, have merit; and so, of the thirteen assignments* complaining of the court's giving, or refusing to give, instructions. This leaves appellants' assignments complaining of appellees' counsel's argument before the jury as improper, to be discussed.

 It appears from the court's modification of defendants' bill of exception No. 1 that one of defendants' attorneys had asked each juror on the voir dire examination whether he had any prejudice against acquiring property by limitation, and further asked each juror whether, if selected, he would lay aside such prejudice as he might have against so acquiring property. Commenting on these questions, appellees' counsel made reference to the "Merchant of Venice" and stated that, while the bargain between Shylock and Antonio was a hard one, Shylock was properly permitted a foreclosure of his lien on Antonio's flesh but not on his blood, which his contract gave him no right to. Counsel then stated that if the jury had any prejudices against a limitation case they should lay them aside, and try the case according to the law and evidence, but should not find in favor of the limitation issues unless required to do so by the preponderance of the evidence. Appellees' counsel did not liken defendant Gross to Shylock, but appellants' attorney, in his answering argument, said of intervener Spawn that he was the only Shylock in the case, as he had loaned money to the plaintiff, and foreclosed plaintiff's interest in the property.

: Such bill of exception shows that appellants complained of the argument as being inflammatory and as appealing to the prejudices of the jurors, but does not state why it was so considered. The moral of the "Merchant of Venice" is, of course, that where a man seeks to enforce the rights that cold law give him, without regard to the suffering that enforcement may entail, he should get no more than the rigor of the law will give him, and if that results in breaking him, he should still be left to cold law. If, however, the characterization of Shylock is subject to the construction evidently assumed by appellants, it lampoons a great people. But there is no reason to suppose that counsel had any intention, by his remarks, to lampoon the Jews, nor is there any evidence in the record that appellants are Jews. The reference was not an inappropriate comment on the fact that cold law will give a squatter, who holds land adversely for the prescribed term, title to it, but not if he holds it only for the prescribed term, less one day. We are in complete accord with, Hewitt v. Buchanan (Tex.Civ. App.) 4 S.W.(2d) 169, 171, 178, where this language is used: "It is needless to state that anything that savors of an appeal to racial or religious prejudice will not be tolerated in the trial of a case involving either the civil rights or the liberties of citizens."

The argument complained of simply does not savor of an appeal to racial or religious prejudices.

■ Again, appellees' counsel said in argument; substantially, that defendants are taking the position that it is all right to skin the intervener, but not to skin the plaintiff, and then quoted the doggerel about some folks saying a nigger won't steal, that ends up, "That ain't stealing, that's just taking." Counsel then stated, "Mr. Gross says he is not stealing, but is just taking." These remarks, not being shown not to have been called for by argument of opposing counsel, will be presumed to have been so. Kansas City, etc., R. Co. v. West (Tex.Civ.App.) 149 S.W. 206. It is obvious that counsel was not charging defendant with trying to do anything denounced by the laws against theft, in seeking to acquire the property in dispute by adverse possession. Gross was not claiming to have been in possession of the land as a naked trespasser, but under the belief that the fence was on the line

called for in his deed. The propriety of the argument, as answering opposing counsel's argument, rests in the sound discretion of the trial court. Texas Midland R. R. v. Wiggins (Tex.Civ.App.) 161 S.W. 445; Glover v. Pfeuffer (Tex.Civ.App.) 163 S.W. 984; Nimitz v. Holland (Tex.Civ. App.) 217 S.W. 244; Holland v. Nimitz, 111 Tex. 419, 232 S.W. 298, 239 S.W. 185; Heard v. Heard (Tex.Civ.App.) 272 S.W. 501; Fidelity, etc., Ins. Co. v. Mumaw (Tex. Civ.App.) 287 S.W. 120.

■ Again it appears that appellants' counsel had argued that the jury should believe the plaintiff's testimony, wherein he had testified that he had passed by the property, and had not noticed the fence had been moved, and inferred therefrom that the fence had not been moved; in response to which argument opposing counsel had stated that by asking the jury to believe plaintiff's testimony, appellants' counsel had hanged himself, when he had intended to hang appellees, and likened such action to the incident of Haman causing the gallows to be built for the purpose of having Mordecai hanged, but. got hanged thereon himself. While, as stated, the evidence fails to show that appellants were Jews, we fail to see how this could possibly be construed as an appeal to any religious prejudices of the jurors. It was a rather obvious answer suggested by appellants' argument.

. ■ Again it appears that appellees' counsel, in referring to an iron stake found near one of the corners of the 2-acre tract, stated, in argument, that he had made no charge or insinuation that defendant had anything to do with the stake's removal, but agreed with opposing counsel that, if the pipe had been removed by one who desired to suppress evidence, he would have taken it away, and not left it on the ground; that if there was any suggestion that defendant had removed the stake, it did not come from plaintiff, intervener, nor their attorney, but solely from defendants' counsel, and that a distinguished compatriot of defendants' counsel had said, "the wicked fleeth when no man pursueth," and that there was certainly no • necessity for defending against any charge in connection with the pipe. This was an incidental reference to appellants' counsel as being Jewish. But it was certainly not of a nature that could have the remotest tendency to prejudice the rights of appellants.

■ We have carefully examined the record. The verdict of the jury conformed to the preponderance of the evidence. The judgment of the trial court ought to be affirmed, and it is so ordered.

Affirmed.